JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* JUNTA DE RETIRO PARA MAESTROS, demandada y recurrida.

*Número:* JR-90-83          *Resuelto:* 20 de diciembre de 1990

624

*Leticia Rodríguez García*, abogada de la peticionaria; *Miguel Palou Sabater* y *Jorge Calero Blanco*, de *Ledesma, Palou y Miranda*, abogados de las recurridas.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nuevamente comparece la Junta de Relaciones del Trabajo de Puerto Rico para solicitar que resolvamos que la Junta de Retiro para Maestros es un "patrono" y ordenemos que negocie colectivamente con su Hermandad de Empleados. Por entender que no han ocurrido cambios sustanciales que ameriten variar nuestros pronunciamientos en *J.R.M. v. J.R.T.*, 108 D.P.R. 448, 457 (1979), y por considerar que esta entidad magisterial "no está diseñada, ni organizada, ni facultada para funcionar como una empresa o negocio privado", declinamos poner en vigor la decisión y orden emitida por la Junta de Relaciones del Trabajo de Puerto Rico.

I

La controversia de autos surge como consecuencia de una petición de investigación y certificación de representante hecha por la Hermandad de Empleados de la Junta de Retiro para Maestros (en adelante Hermandad) ante la Junta de Relaciones del Trabajo. El propósito de la petición era representar a un grupo de trabajadores de la Junta de Retiro para Maestros (en adelante Junta de Retiro) para poder negociar colectivamente con esta institución. El 15 de marzo de 1989 la Junta de Relaciones del Trabajo certificó a la Hermandad como representante de los trabajadores.

Enterada de esa decisión, la Junta de Retiro rehusó negociar colectivamente con el gremio. Por esa negativa la Hermandad presentó ante la Junta de Relaciones del Trabajo un cargo por práctica ilícita en el trabajo. Celebrada la correspondiente vista, la Junta de Relaciones del Trabajo emitió una orden de cese y desista, y ordenó a la Junta de Retiro que negociara colectivamente con la Hermandad. Al así hacerlo, concluyó que la referida institución era patrono en conformidad con el Art. 2 de la Ley Núm. 130 de 8 de mayo de 1945, según enmendada, 29 L.P.R.A. sec. 63(2) y (11).

En vista de la negativa de la Junta de Retiro para iniciar el diálogo conducente a la preparación de un convenio colectivo, la Junta de Relaciones del Trabajo comparece ante nos para que pongamos en vigor la referida orden. Examinado el recurso, concedimos término a la Junta de Retiro para que mostrara causa por la cual no debiera expedirse el auto y ponerse en vigor la orden aludida. Ésta ha comparecido y nos plantea básicamente que erró la Junta de Relaciones del Trabajo al considerarla patrono sin haber ocurrido cambios sustanciales en su organización que le ameritaran ser considerada como tal. Por los fundamentos que expondremos, concluimos que le asiste la razón.

## II

■ Para resolver la controversia suscitada en el caso de autos, debemos acudir inicialmente a la Ley de Relaciones del Trabajo de Puerto Rico, Ley Núm. 130, *supra*, que en su Art. 2 nos provee las definiciones de "patrono" e "instrumentalidades corporativas":

El término "patrono" incluirá ejecutivos, supervisores y a cualquier persona que realizare gestiones de carácter ejecutivo en interés de un patrono directa o indirectamente, pero no incluirá excepto en el caso de las instrumentalidades corporativas del Gobierno de Puerto Rico como más adelante se definen, al Gobierno ni a ninguna subdivisión política del mismo; Disponiéndose, que incluirá, además, a todo individuo, sociedad u organización que

intervenga a favor de la parte patronal en cualquier disputa obrera o negociación colectiva. 29 L.P.R.A. sec. 63(2).

El término "instrumentalidades corporativas" significa las siguientes corporaciones que poseen bienes pertenecientes a, o que están controladas por, el Gobierno de Puerto Rico: La Autoridad de Tierras, la Compañía Agrícola, el Banco de Fomento, la Autoridad de Energía Eléctrica, la Compañía de Fomento Industrial de Puerto Rico, la Autoridad de los Puertos, la Autoridad de Comunicaciones, y las subsidiarias de tales corporaciones, e incluirá también las empresas similares que se establezcan en el futuro y sus subsidiarias, y aquellas otras agencias del Gobierno que se dedican o puedan dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario. 29 L.P.R.A. sec. 63(11).

■ Según se puede apreciar, el estatuto define taxativamente cuáles son las instrumentalidades corporativas sujetas a su regulación. Además de enumerarlas, esta disposición establece que las agencias "que se dedican o puedan dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario", 29 L.P.R.A. sec. 63(11), están dentro de la definición de "instrumentalidad corporativa" y, por ende, están autorizadas a negociar colectivamente con sus empleados. 29 L.P.R.A. sec. 65; *J.R.T. v. Asoc. Servs. Médicos Hosp.*, 115 D.P.R. 360, 366 (1984); *Junta Rel. Trabajo v. Club Deportivo*, 84 D.P.R. 515 (1962).

■ En ese sentido y al amparo de nuestra constitución,[1] en *A.A.A. v. Unión Empleados A.A.A.*, 105 D.P.R. 437 (1976), formulamos unos criterios para determinar qué constituye una instrumentalidad del Gobierno que funciona como empresa o negocio privado. Dijimos que habría que evaluar, entre otros factores: (1) si los empleados de la agencia concernida están cubiertos por la Ley de Personal del Estado Libre Asociado; (2) si los servicios prestados por la agencia, por su naturaleza intrínseca, nunca han sido prestados por la empresa privada; (3) si la agencia está capacitada para funcionar como una empresa o

---

[1] Art. II, Secs. 17–19, Const. E.L.A., L.P.R.A., Tomo 1.

negocio privado; (4) si la agencia de hecho funciona como una empresa o negocio privado; (5) el grado de autonomía fiscal de que disfrute la agencia; (6) el grado de autonomía administrativa de que goce; (7) si se cobra o no un precio o tarifas por el servicio rendido (precio que debe ser básicamente equivalente al valor del servicio); (8) si los poderes y las facultades concedidas en la ley orgánica de la agencia la asemejan fundamentalmente a una empresa privada, y (9) si la agencia tiene o no la capacidad para dedicarse en el futuro a negocios lucrativos o a actividades que tengan por objeto un beneficio pecuniario.

Sin pretender agotar la lista, también pueden considerarse otros criterios: (1) la estructura en sí de la entidad; (2) la facultad de la agencia para demandar y ser demandada ilimitadamente; (3) el poder de obtener fondos propios en el mercado general de valores a base de su situación fiscal y sin empeñar el crédito del Estado Libre Asociado, y (4) la facultad de adquirir y administrar propiedades sin la intervención del Estado. *A.A.A. v. Unión Empleados A.A.A.*, supra, pág. 455.

La doctrina antes expuesta nos brindó la oportunidad de evaluar previamente si, al amparo de la Ley de Relaciones del Trabajo de Puerto Rico, la Junta de Retiro era un patrono. De esa forma en *J.R.M. v. J.R.T.*, supra, evaluamos cuidadosamente su estructura organizativa y sus poderes para invertir los fondos aportados por los maestros y concluimos que la Junta de Retiro no era un patrono. Por su relevancia al caso de autos, reproducimos el excelente análisis de la opinión del Tribunal suscrita por el Juez Asociado Señor Rigau:

Como vimos el propósito de la Junta de Retiro es el administrar el sistema de anualidades y pensiones de los maestros de Puerto Rico. Su función no es comercial, no opera con ánimo de lucro, sino que es un organismo eminentemente de servicio a los miembros de la matrícula. Tanto el sistema de anualidades y pensiones de los maestros como la Junta que lo administra son instituciones benéficas de la naturaleza de montepío. Pretender que son corporaciones con el carácter comercial que han tomado la Autoridad de las Fuentes Fluviales y otras es desatender la realidad y desnaturalizar los humanos y benéficos propósitos de las dos mencionadas institu-

628

ciones. Sus empleados están sujetos a la Ley de Personal. La estructura de la Junta está taxativamente determinada por ley, según expresamos anteriormente. La ley le limita el tipo de valores y préstamos en que puede invertir sus reservas. No puede recurrir al mercado general de valores libremente y emitir bonos. No tiene verdadera autonomía fiscal. Sus fondos y desembolsos no están bajo su completo control. Las deducciones a los maestros por las cuotas corrrespondientes las hace el Secretario de Instrucción Pública y son depositadas en una cuenta bajo control del Secretario de Hacienda. Lo mismo ocurre con la aportación gubernamental. Los desembolsos se hacen por conducto del Secretario de Hacienda. La Junta no tiene facultad para aumentar sus ingresos ni reducir sus desembolsos, pues las cuotas de los maestros y las aportaciones gubernamentales se determinan por ley.

La Junta de Retiro carece de facultad para emplear o despedir a sus empleados, no puede expandir a su matrícula pues la misma está dispuesta por ley; está limitada exclusivamente a los maestros. Todo esto demuestra que no tiene verdadera autonomía fiscal y ni siquiera administrativa, que la sitúe en la categoría de similar a las corporaciones privadas y públicas que funcionan como negocios. Esto aparte de la consideración central de que su propósito no es operar un negocio lucrativo, como señalamos, sino dar un servicio de carácter social a los maestros.

Si bien hace préstamos estos son préstamos personales, hipotecarios y para viajes culturales, los cuales también son beneficios y servicios a los maestros . . . las anualidades y pensiones le cuestan mucho menos a los maestros que si las comprasen a cualquiera otra organización privada existente. Se expresó que el sistema de retiro tiene un déficit actuarial de alrededor de $665 millones. Vemos mucho de servicio en esta institución pero poco de ánimo lucrativo. De hecho, se demostró que la Junta de Retiro no está diseñada, ni organizada, ni facultada para funcionar como una empresa o negocio privado. *J.R.M. v. J.R.T.*, supra, págs. 456–457.

### III

La Junta de Relaciones del Trabajo sostiene que los cambios en la ley orgánica de la Junta de Retiro la han convertido en una institución que opera con fines lucrativos. También expone que el funcionamiento actual de la institución se asemeja al de una instrumentalidad corporativa.

Sobre la primera contención de la peticionaria, notamos que los cambios en la ley orgánica de la Junta de Retiro consisten en la aprobación de una serie de leyes que ofrecen mayores beneficios a los participantes del sistema. Así, por ejemplo, se le confirió un aumento de veinticinco dólares ($25) mensuales a los empleados,[2] cien dólares ($100) de aumento por concepto de aguinaldo navideño sufragable por el Sistema de Anualidades y Pensiones para Maestros,[3] y la acreditación de servicios prestados en las fuerzas armadas.[4] También se estableció una cuantía mínima de trescientos dólares ($300) de pensión a los participantes, así como un aumento de cincuenta dólares ($50) mensuales en la pensión vitalicia.[5]

Sobre el funcionamiento de la Junta de Retiro como una institución con fines lucrativos, la Junta de Relaciones del Trabajo argumenta, entre otras cosas, que los ingresos del sistema se acreditan a su nombre en el Departamento de Hacienda y que posee autonomía real para llevar a cabo gestiones de tipo empresarial. Añaden que la institución es autónoma para preparar su presupuesto y que desde 1978 se han producido cambios en las ganancias obtenidas y en la acumulación de capital. Sobre ese particular señalan que han ampliado su política de inversiones, asemejándose a la empresa privada, y que como ente inversionista han sobrepasado las aportaciones del Estado y sus asegurados.

■ De un examen de los argumentos esbozados por la Junta de Relaciones del Trabajo notamos que parten de la premisa que "solidez financiera" es sinónimo de "empresa lucrativa". Tal hipótesis es errónea. En primer lugar, las enmiendas a la ley orgánica no modifican la estructura administrativa y jurídica de la Junta de Retiro. Éstas sólo se refieren a incrementos en los beneficios que reciben los participantes del sistema. Concluir que esos beneficios han producido un cambio sustancial

---

[2]   Ley Núm. 190 de 26 de julio de 1979 (18 L.P.R.A. sec. 366b(2)).
[3]   Ley Núm. 49 de 23 de mayo de 1980 (18 L.P.R.A. sec. 383).
[4]   Ley Núm. 13 de 2 octubre de 1980 (29 L.P.R.A. sec. 814(C)(a)).
[5]   Ley Núm. 9 de 6 de agosto de 1987 (18 L.P.R.A. sec. 321n.).

en el ordenamiento administrativo y jurídico de la Junta de Retiro, de modo que lo conviertan en un negocio con fines de lucro, sería contrario a la naturaleza del sistema de beneficios de esa organización. Véase *J.R.T. v. Asoc. Servs. Médicos Hosp.*, supra, pág. 364. Estas enmiendas en nada afectan o alteran ni el propósito básico de la Junta de Retiro de proveer servicios a los pensionados ni su naturaleza de montepío. *J.R.M. v. J.R.T.*, supra.

■ Por otro lado, los restantes argumentos de la Junta de Relaciones del Trabajo se concentran en la adopción de una política de inversiones por parte de la Junta de Retiro. Entendemos, contrario a la Junta de Relaciones del Trabajo, que la utilización de esa política no convierte a la Junta de Retiro en una organización con fines lucrativos. Con el propósito de reducir el déficit del Sistema de Retiro para Maestros, la Asamblea Legislativa aprobó la Ley Núm. 47 de 29 de junio de 1988 (18 L.P.R.A. sec. 323). Con esta ley el legislador amplió la capacidad de inversiones y préstamos del sistema para, en lo posible, obtener un rédito máximo por la inversión de sus recursos. De la exposición de motivos del estatuto se desprende que el sistema tenía grandes problemas financieros y que, preocupada con el déficit actuarial, la Asamblea Legislativa quiso concederle a la Junta de Retiro "la flexibilidad y agilidad necesaria para implantar . . . una política de inversiones, que le permita aprovechar, en forma óptima, las oportunidades de inversión que estén disponibles en los mercados financieros contemporáneos y los que se anticipen para el futuro". 1988 Leyes de Puerto Rico 228. Conscientes de que el déficit actuarial ponía en peligro el sistema de pensiones, la Asamblea Legislativa entendió que en la medida en que las inversiones tuvieran un mayor rendimiento se reduciría el déficit y los costos corrientes del sistema.

■ De modo, pues, que el propio estatuto disipa la posibilidad de que la Junta de Retiro se convierta en una entidad de naturaleza comercial o lucrativa. En cambio, se desprende que este tipo de gestión, o cualquier otra, buscaba aliviar una crisis fiscal que afectaba a los participantes del sistema. La política de

acumulación del capital por medio de inversiones, que autorizó el estatuto en cuestión, en última instancia estableció las condiciones para mejorar las condiciones financieras del sistema y asegurar que pudiese cumplir sus obligaciones con los pensionados.

En ese sentido la Junta de Retiro continúa siendo el organismo rector del sistema gubernamental de pensiones de los maestros del Sistema de Instrucción Pública. Su objetivo fundamental también es el mismo: la administración de un sistema de pensiones para los maestros de Puerto Rico. Sus ingresos constituyen los instrumentos provistos por el legislador para tener la solidez y solvencia financiera que requiere un buen plan de pensiones.

Por otro lado, sus empleados están comprendidos en la Oficina Central de Administración de Personal (O.C.A.P.) y ventilan sus apelaciones ante la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.). La decisión de la Junta de Relaciones del Trabajo ignora completamente esta realidad y no contempla la diferencia de que las corporaciones públicas, por disposición de ley, son administradas individualmente con facultad para atemperar su sistema de personal a las disposiciones de los convenios colectivos. En estas circunstancias, poner en vigor la decisión de la Junta de Relaciones del Trabajo podría crear grandes problemas sobre el sistema de personal vigente y su estructura organizativa.

No podemos refrendar la posición de la peticionaria. De la exposición anterior es evidente que el mejor curso decisorio en este caso es ratificar nuestros pronunciamientos en *J.R.M. v. J.R.T.*, supra, y dejar sin efecto la decisión y orden emitida en el caso de autos por no existir cambios sustanciales que conviertan a la Junta de Retiro en una institución con fines pecuniarios. Por tales fundamentos, *expedimos el auto y resolvemos que la Junta de Retiro de Maestros no es patrono en conformidad con la Ley de Relaciones del Trabajo. Erró la Junta de Relaciones del*

*Trabajo al así determinarlo. Se dictará sentencia de conformidad.*

El Juez Asociado Señor Negrón García disiente con opinión escrita. El Juez Asociado Señor Rebollo López concurre con el resultado sin opinión escrita.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

La función de impartir justicia exige *consistencia.* En el caso de autos esa característica se proyecta sobre los postulados básicos regulatorios de la revisión judicial de las agencias administrativas. Después de todo, la experiencia y el conocimiento especializado desarrollado por esas agencias, salvo contadas excepciones, superan cualquier intento de sustituir su discreción por la nuestra.

I

La Junta de Relaciones del Trabajo, en el descargo de las funciones delegadas por la Asamblea Legislativa, celebró vistas y recibió prueba en torno a la Junta de Retiro para Maestros (Junta de Retiro). A base de su evaluación y orientada por nuestros pronunciamientos en *A.A.A. v. Unión Empleados A.A.A.,* 105 D.P.R. 437 (1976), concluyó que las circunstancias de la Junta de Retiro habían variado de tal forma que debía ser considerada patrono, dentro del significado del Art. 2 de la Ley de Relaciones del Trabajo de Puerto Rico, 29 L.P.R.A. sec. 63(2).

La Junta de Relaciones del Trabajo formuló su dictamen tomando en cuenta la situación *actual* de la Junta de Retiro respecto a sus funciones y a su autonomía fiscal, así como a su capacidad para invertir y a acumular ganancias.[1] Concluyó que funciona y opera como una instrumentalidad corporativa y, como

---

[1] Entre otros, la Junta de Relaciones del Trabajo consideró los factores siguientes:
"A- Enmiendas a la Ley Orgánica de la Junta de Retiro para Maestros.

consecuencia, sus empleados tienen el derecho a la sindicalización y a negociar colectivamente.

## II

La mayoría hoy revoca fundada en un análisis erróneo de la política de inversiones de la Junta de Retiro y en la relación de sus empleados con la Oficina Central de Administración de Personal. Al hacerlo han sustituido infundadamente conclusiones e interpretaciones de la Junta de Relaciones del Trabajo. Nos explicamos.

*Primero*, es obvio que el que se haya ampliado la capacidad de inversiones y préstamos con el propósito de resolver unos proble-

---

"B- En la actualidad la Junta de Retiro para Maestros tiene facultad para aumentar sus ingresos, a[u]n cuando las cuotas que aportan los maestros, así como la aportación patronal, las fija la Ley.

"C- En la actualidad, la Junta de Retiro para Maestros es una instrumentalidad dedicada a fines lucrativos.

"D- Todos los ingresos que entran al Sistema de Retiro se acreditan a su nombre en los libros del Secretario de Hacienda. Dichos fondos no se funden ni se mezclan con otros custodiados por dicho funcionario.

"E- Los desembolsos de dinero de la Junta de Retiro se hacen por conducto del Secretario de Hacienda, siempre que estos excedan de cuatro mil dólares ($4,000.00). La Junta de Retiro expide cheques por debajo de esa cantidad.

"F- Actualmente la Junta de Retiro para Maestros posee la autonomía real y necesaria para llevar a cabo sus gestiones de tipo empresarial.

"G- La Junta tiene facultad para contratar los servicios de monitor, corredores de bienes raíces, notarios, tasadores, asesores legales, actuarios, estadísticos, médicos y cualquier otro que entienda necesario para llevar a cabo sus funciones.

"H- La Junta es autónoma en cuanto a la preparación de su presupuesto. No lo tiene que someter al escrutinio de ningún otro ente gubernamental. El presupuesto de la Junta no es parte del presupuesto general del Estado Libre Asociado de Puerto Rico.

"I- La Junta planifica sus acciones y tiene autonomía para trazar su plan de trabajo.

"J- La Junta está 'mecanizando' sus operaciones con el fin de mejorar el servicio que ofrece y para disponer de un sistema que le permita detectar fallas y atrasos en las cuentas de sus deudores.

"K- La Junta continúa ofreciendo préstamos personales, hipotecarios y de viajes culturales a sus miembros.

"L- Desde 1978 hasta el presente se han producido cambios notables y sustanciales en las ganancias obtenidas por la Junta, sin embargo, los servicios ofrecidos a sus miembros han permanecido estables, con la excepción de aumentos moderados en los beneficios que ofrece.

"M- La Junta ha experimentado cambios significativos en la acumulación de capital, lo que la mueve hacia una política de inversiones agresiva y autónoma que la asemeja a la empresa privada, teniendo a su favor, la legislación del 29 de junio de 1988, la cual flexibilizó su poder de inversión y los medios para obtener mejores ganancias en esa gestión." Informe Oficial Examinador, págs. 4–7.

mas financieros no anula la determinación de que la Junta de Retiro opera *ahora* como un negocio lucrativo. Ciertamente su estructura administrativa y financiera la asemejan a una instrumentalidad corporativa. Precisamente, el déficit actuarial y la necesidad de proteger el sistema de pensiones obligaron a la Asamblea Legislativa a convertirla en una institución con fines lucrativos.

*Segundo,* si bien sus empleados pertenecen a la Oficina Central de Administración de Personal y ventilan sus apelaciones ante la Junta de Apelaciones del Sistema de Administración de Personal (J.A.S.A.P.), ese dato no es determinante en el análisis de los factores expuestos en *A.A.A. v. Unión Empleados A.A.A.,* supra. Se trata de un criterio entre los muchos allí mencionados. Si aceptamos la tesis mayoritaria, estaríamos reduciendo sustancialmente los factores decisorios para resolver cuándo una agencia funciona como una empresa privada a la simple ecuación de si sus empleados están cubiertos por la Ley de Personal.

Y, *finalmente,* en reiteradas ocasiones hemos sostenido que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto. La revisión judicial se limita a determinar si la agencia actuó arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de discreción. *A.R.P.E. v. J.A.C.L.,* 124 D.P.R. 858 (1989); *Murphy Bernabe v. Tribunal Superior,* 103 D.P.R. 692 (1975). Ninguna de esas circunstancias están aquí presentes.